## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**TEAM INDUSTRIAL SERVICES, INC.,**

     **Plaintiff,**

     **v.**

**ZURICH AMERICAN INSURANCE
COMPANY, et al.,**

     **Defendants.**

**Case No. 2:19-cv-02710-HLT**

### MEMORANDUM AND ORDER

This case arises out of an insurance dispute. Plaintiff Team Industrial Services, Inc. ("Team") performed work at one of Defendant Westar Energy, Inc.'s ("Westar") facilities in Kansas. Two of Westar's employees were then fatally injured in an incident arising out of that work. Team seeks insurance coverage from Defendants Zurich American Insurance Company ("Zurich"), Westchester Fire Insurance Company ("Westchester"), and Endurance American Insurance Company ("Endurance") for its liability stemming from these deaths. These three insurance companies provided coverage for an Owner Controlled Insurance Program ("OCIP") created by Westar. Zurich determined that Team was not enrolled in its policy and denied coverage. Westchester, who issued a first-layer excess policy over the Zurich policy, also denied coverage. Endurance issued a second-layer excess policy over Westchester's policy.

Defendant Kelli Most ("Most") sued Team in Texas state court for wrongful death, and the jury returned a $222 million verdict. Team now brings claims in federal court for (1) declaratory judgment against all parties that Team is insured and entitled to defense and indemnity for the Texas case; (2) contract reformation against Zurich; (3) breach of contract against Zurich and

separately against Westar; (4) breach of fiduciary duty against Westar; and (5) promissory estoppel against Zurich and Westar.[1]

Before the Court are battling full and partial motions for summary judgment and a motion for dismissal/judgment on the pleadings. Several other motions are also pending. This order substantively addresses the following motions: Zurich's motion for summary judgment (Doc. 306); Endurance's motion for summary judgment (Doc. 312); Westar's motion for summary judgment (Doc. 315); Team's motion for partial summary judgment regarding contractual construction (Doc. 321); Westchester's motion for summary judgment (Doc. 323); and Most's motion to dismiss and/or for judgment on the pleadings (Doc. 329).

The uncontroverted evidence shows that Zurich and the other OCIP insurers did not insure Team. Team therefore is not entitled to declaratory judgment. Neither is there a valid basis for reforming the Zurich policy to provide coverage to Team. Nor did Zurich or Westar breach a contract with Team. Westar did not have a fiduciary duty to provide Team with OCIP coverage. And neither Zurich nor Westar are estopped from denying Team OCIP coverage. Zurich, Westar, Westchester, and Endurance are entitled to summary judgment on Team's claims. Most is also entitled to some relief on her motion, but the Court addresses the claim against her separately because she is in a different position than the other defendants.

---

[1]  There appears to be confusion over whether Team still asserts a quasi-estoppel claim against Zurich. The Court dismissed Count VII (the quasi-estoppel claims against Westar and Zurich in the amended complaint) in its August 25, 2021 order. Doc. 199 at 14-15. Team did not include any remaining cause of action against Zurich for quasi-estoppel in the pretrial order. Doc. 305 at 32-33. But Zurich mentioned it in both the pretrial order and its briefing in case the Court determined the cause of action remained viable despite its dismissal as pleaded against Westar. Doc. 199 at 14-15. Given the Court's previous order and Team's failure to allege quasi-estoppel as a cause of action in the pretrial order, the Court does not consider this claim further.

## I.    BACKGROUND[2]

### A.    General Background

Westar is an electrical utility company.[3] It operates various facilities, including the Jeffrey Energy Center ("JEC") near St. Marys, Kansas. The JEC is a coal-fired power plant. Westar hires contractors to perform work at its facilities. Two of those contractors were Team and Furmanite America, Inc. ("Furmanite").

Westar entered into a Master Services Agreement ("MSA") with Furmanite on August 10, 2010. Furmanite was to provide certain valve maintenance services for Westar. The Furmanite MSA was Contract No. 902236 and was for work at the JEC and other locations. Westar also entered an MSA with Team on September 1, 2010. The Team MSA was Contract No. 902228 and was for work at the JEC and other locations. The Team MSA provided for Team to provide certain "pre-heat and stress relieving" services for Westar. Both contracts included some common elements:

- Articles 16 and 17 of both contracts require the contractor to "procure and maintain [its own] liability insurance" and "comply with all applicable state laws with reference to" workers' compensation insurance for work performed at the JEC. Contractors must also name Westar and its "directors, officers, and employees" as additional insureds on the liability insurance. Docs. 307-2 at 5, 7; 307-4 at 5, 7.

- Article 36 of both contracts is an integration clause: "**ENTIRE AGREEMENT.** This Contract represents the entire agreement between the Parties and super[s]edes and replaces any prior agreement between the Parties related to the Schedule of Work to be Done. This Contract may be amended only by written agreement of the Parties." Docs. 307-2 at 11; 307-4 at 11.

- Section 6 of both contracts provides: "**CONTRACTOR'S STATUS,**" that the contractor is "an independent contractor and . . . not the agent, partner or joint venturer of [Westar]." Docs. 307-2 at 3; 307-4 at 3.

---

[2]    The Court considers the following facts uncontroverted for purposes of summary judgment.

[3]    Westar is now known as Evergy Kansas Central, Inc.

- Article 33 of both contracts provides: "**THIRD PARTY RIGHTS**. Nothing in this Contract shall be construed to give any rights or benefits to anyone other than Company and Contractor." Docs. 307-2 at 11; 307-4 at 11.

Westar instituted an OCIP in 2013. The parties have stipulated to the following definition of an OCIP:

> An OCIP is a type of insurance policy that may provide workers' compensation, general liability, and/or other insurance coverage to the owner and any eligible contractor that is enrolled in the OCIP for work performed at a participating location or set of locations.
>
> In an OCIP, the OCIP insurer determines which types of contractors are excluded based on the type of work performed. However, the owner has the ultimate option to exclude other contractors in addition to those excluded by the OCIP insurer and can exclude any such contractors for any reason.

Doc. 305 at 4 ¶¶ 12, 13. Westar required some contractors to enroll in the OCIP, but not all. Westar engaged Aon Risk Services Southwest, Inc. ("Aon") to administer the OCIP. Team, however, maintains that Westar was the designated "OCIP Administrator" as provided in the Owner Controlled Insurance Program Requirements ("OCIP Requirements"). Team is correct as to the terminology; the document does list Westar as the administrator and Aon as the broker. Doc. 307-10 at 2. The parties debate whether this distinction in terminology is material.

### B. Furmanite Contract Amendment and Enrollment in OCIP

Furmanite applied for enrollment in the OCIP on July 31, 2013. Westar and Furmanite later executed Change Order No. 1 to the Furmanite MSA on November 4, 2013, which modified Articles 16 and 17 to add the following: "[Westar], at its sole option and cost, reserves the right to implement an [OCIP] and, except as otherwise provided herein, maintain at all times during the performance of this Contract, the insurance specified in Attachment 4, [OCIP Requirements]." Doc. 307-10 at 1. The OCIP Requirements document was attached to Change Order No. 1. The requirements and the OCIP manual detail the enrollment process. Change Order No. 1 did not

"establish an OCIP, give Furmanite the right or obligation to enroll in an OCIP, create insurance coverage, or otherwise change the Furmanite MSA's insurance requirements." Doc. 305 at 5 ¶ 29. Upon enrollment, Furmanite received login credentials for a portal operated by Aon. Furmanite was required to report payroll hours in the portal each month.

Once Westar implemented the OCIP, Westar was obligated to "maintain insurance as specified in Sections 1.2 through 1.4 [of the OCIP Requirements] . . . ." Doc. 327-6 at 1, § 1.1. And Westar must afford an opportunity for replacement coverage at Westar's expense before expiration of the OCIP coverage "[i]n the event [Westar], for any reason, [was] unable to furnish or after commencement of Work or Services elect[ed] not to furnish or to continue to furnish the insurance as specified in Sections 1.2 through 1.4 and upon thirty (30) days written notice from [Westar]." Doc. 327-6 at 11, § 1.10. Westar did not provide Furmanite (or Team) any such notice or opportunity.

Furmanite's OCIP coverage was auto-renewed each year after 2013. Furmanite did not submit a re-enrollment application to continue coverage. It appears that Aon and Westar may have submitted a 2018 re-enrollment on Furmanite's behalf. But how and why that happened is not material to the issues before the Court. The bottom line is Furmanite's coverage continued, even after it perhaps should have ended.

### C.     Team Contract Amendment

Westar decided not to include Team in the OCIP. This business decision was memorialized in an e-mail dated March 11, 2014.

Team and Westar entered into Change Order No. 1 to the Team MSA on March 14, 2015. The Change Order did not amend Articles 16 or 17 of the Team MSA regarding insurance. The next amendment was Change Order No. 2 and is discussed below.

5

### D.      Team's Affiliation with Furmanite

On February 29, 2016, Team's parent company acquired Furmanite's parent company. Team and Furmanite became sister companies but never merged. Before that time, the two companies had no corporate affiliation.

Westar and Team entered into Change Order No. 2 on September 1, 2017. Change Order No. 2 provides:

> **Note**: On February 29, 2016 Furmanite was acquired by TEAM Industrial Services, Inc. This change order will consolidate the two services contracts that Furmanite (902236) and TEAM (902228) hold with Westar Energy and become **effective as of September 1, 2017.**
>
> Furmanite Contract 902236 will be **retired** and all pending PO's under the previous FURMANITE supplier ID 0000533098 will be reissued under TEAM INDUSTRIAL SERVICES, INC., supplier ID 0000431446 to be governed by the terms & conditions of Contract 902228.

Doc. 305 at 6 ¶ 40.

Team and Furmanite continued to work as different legal entities after the acquisition. But before Zurich underwrote the 2018 OCIP coverage, the National Council on Compensation Insurance ("NCCI") issued a combined "experience modifier," for Team and Furmanite, which compares a company's workers' compensation claims history to the industry average. A combinable experience modification means two companies are treated the same for claims history.[4]

---

[4]    The Court questions how this fact is relevant. Team deemed it significant enough to include as an explanation why it is irrelevant that Team and Furmanite did not "merge" in the sense of a corporate merger. But Team never applied the fact to its claims or demonstrated its relevance as to whether Team had OCIP coverage. Nevertheless, the Court includes it here to give Team the benefit of the doubt about the relationship between Team and Furmanite.

E.     **The OCIP and 2018 OCIP Policy**

The OCIP Requirements specify that: "The OCIP shall apply to eligible Contractors and Subcontractors who have complied with the insurance requirements, completed the enrollment process and received notification of enrollment from the OCIP Administrator. [Westar] reserves the right to exclude any Contractor and/or Subcontractor from the OCIP." Doc. 314-8 at 2 § 1.1.c.

The OCIP manual sets forth the enrollment process. The first page of the manual states:

**OCIP ENROLLMENT IS <u>NOT</u> AUTOMATIC**

COVERAGE IS NOT BOUND UNTIL CONTRACTOR RECIEVES AN OCIP CERTIFICATE OF INSURANCE FROM AON

Eligible Contractors and all eligible Subcontractors MUST complete the enrollment forms and participate in the enrollment process to be considered for participation in the Westar Energy Rolling Owner Controlled Insurance Program

Doc. 314-10. "Enrolled parties, contractors/subcontractors" are defined in the manual as "[t]hose eligible Contractors and subcontractors that have submitted all necessary information and have been accepted into the OCIP as evidenced by an OCIP Certificate of Insurance." *Id*. at 9. The manual also states:

**Enrollment**

Each Contractor shall provide details about its subcontractors as necessary for OCIP enrollment. Westar Energy will need all of the information requested on the Enrollment Application form (Aon-3) in Section 8. This form must be completed and submitted to the OCIP Administrator <u>prior to mobilization</u> to obtain coverage under the OCIP and within 10 days of the effective date.

A separate Enrollment Application form (Aon-3) is required for each Eligible subcontractor of any tier that performs Work at the Westar Energy Site(s). A separate Workers' Compensation policy will be issued to each Enrolled Party.

> The OCIP Administrator will issue to each Enrolled Party a Confirmation Welcome Letter and an OCIP Certificate of Insurance acknowledging acceptance of the applicant into Westar Energy's OCIP.
>
> **Note: Enrollment is NOT automatic**
>
> Enrollment into the OCIP is required, but not automatic. Eligible Contractors and all Eligible Subcontractors MUST complete the enrollment forms and participate in the enrollment process for OCIP coverage to apply. Access to the Westar Energy Site(s) will not be permitted until enrollment is complete. The OCIP Certificate of Insurance will confirm acceptance of applicant into the Westar Rolling OCIP.

*Id*. at 20.

The parties stipulate in the pretrial order that "Westar, as the owner, had the discretion to determine which eligible contractors could participate in the Westar OCIP." Doc. 305 at 7. In other words, contractors (including Team) could not unilaterally include themselves in the OCIP. Westar neither invited Team to join the OCIP nor intended to do so.

Team never submitted an enrollment application for the Westar OCIP. Neither did Team receive a "Confirmation Welcome Letter, an individual workers' compensation policy, or a certificate of insurance identifying Team in connection with the 2018 Zurich Policy." *Id*. at 7 ¶ 46. A Team employee nevertheless began using Furmanite's login credentials to report payroll hours beginning in 2016. But from June 2017 onward, 0 hours and 0 payroll was reported in the portal every month except one—even though Team had performed work at JEC during that time. The hours and payroll submitted for Team during the one month were unrelated to the accident.

The insurance companies used the information provided through Aon's portal to calculate a premium for Westar's OCIP in 2018. Westar paid premiums to Zurich for the 2018 Westar OCIP policy. The Zurich OCIP policy provides that an insured is:

> 1. Subject to Paragraph 2. below, a contractor of any tier will qualify as a Named Insured, if such contractor:
>> a. Is enrolled in the Owner Controlled Insurance Program for which this policy is provided; and
>> b. Performs operations at a "designated project."

Doc. 307-17 at 59. The Zurich policy also states that rights and duties may not be transferred without Zurich's written consent.

### F.    2018 Accident and Denial of OCIP Coverage

A fatal accident occurred at the JEC on June 3, 2018. Both Jesse Henson and Damien "Craig" Burchett died as a result of the accident. Faulty workmanship by Team employees was an alleged cause of the accident. Team employees performed the work (valve maintenance services) in April 2018.

Team requested insurance coverage from Zurich under Westar's policy. Westar had three insurance policies in the OCIP at the time, all with effective dates of January 1, 2018 to January 1, 2019: Zurich's, Westchester's first-layer excess policy, and Endurance's second-layer excess policy. Both the Westchester and Endurance policies "follow form" from the Zurich policy. Zurich denied coverage, taking the position that Team was not enrolled in the 2018 Zurich policy. Westchester later denied coverage.

## II.    STANDARD

Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to demonstrate that genuine issues remain for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). In applying this standard, courts view the facts and any reasonable inferences in a

light most favorable to the non-moving party. *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 569 (10th Cir. 1994). "An issue of material fact is genuine if a reasonable jury could return a verdict for the nonmoving party." *Id.* (internal quotation and citation omitted).

## III.   ANALYSIS

The parties agree that Kansas law governs most of the disputes resolved below. The Court examines the questions posed throughout the extensive briefing in the following order:[5]

- Is Team entitled to a declaratory judgment against all defendants?

- Should the Court reform the Zurich insurance policy?

- Did either Zurich or Westar breach a contract with Team?

- Did Westar breach a fiduciary duty to Team?

- Can Team recover from Zurich or Westar on a promissory estoppel theory?

- Is Most entitled to dismissal from the case?

The answer to every question except the last one is <u>no</u>.

### A.   Is Team entitled to a declaratory judgment against all defendants?

Team asks the Court to declare that Team was covered by the 2018 OCIP policy. But before getting to the question of whether Team was covered by the OCIP, the Court must address a preliminary issue that is presented by Team's motion for partial summary judgment. This issue is

---

[5] Omitted from this list is the question whether the Texas court's judgment precludes this litigation. Ordinarily, the Court would turn to this question first because it has the potential to be dispositive of the entire case. But here, the Court need not resolve the thorny preclusion issues. Preclusion doctrines seek to prevent one party from relitigating issues and claims already decided. They seek to give finality to judgments and eliminate duplicative litigation. Unfortunately, the goal of eliminating duplicative litigation has already been thwarted; this case has been on file— and been actively litigated—for roughly three years. The parties have filed multiple briefs and spent countless hours debating whether a ruling in Texas should prevent the litigation of this case, among other issues. This Court determines that the most equitable and efficient way to proceed is to turn directly to the substantive dispute, rather than dedicating more bandwidth to a matter that, in practicality, becomes moot because the Court ultimately reaches the same decision as the Texas court.

the contractual construction of Change Order No. 2 to the Team MSA.[6] The Court first construes Change Order No. 2. The Court next looks at whether, based on that construction, Team assumed coverage under the 2018 OCIP policy when Team took over Furmanite's work. The answers to both of these questions are fatal to Team's claim for declaratory judgment.

To answer these questions, the Court must apply precepts of contractual construction. Team has not challenged the relevant language as ambiguous. To the contrary, the parties stipulated in the pretrial order that the language is <u>not</u> ambiguous. Doc. 305 at 7 ¶ 43. And they all argue that parol evidence should only be considered as a back-up if the Court disagrees with their ambiguity assessment.

Ambiguity is a matter of law for courts to decide. *See Waste Connections of Kan., Inc. v. Ritchie Corp.*, 298 P.3d 250, 265 (Kan. 2013).[7] "Ambiguity in a written contract does not appear until the application of pertinent rules of interpretation to the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper meaning." *Catholic Diocese of Dodge City v. Raymer*, 840 P.2d 456, 459 (Kan. 1992) (citation omitted). Courts will not find a contract ambiguous unless it has "provisions or language of doubtful or conflicting meaning." *Simon v. Nat'l Farmers Org., Inc.*, 829 P.2d 884, 888 (Kan. 1992).

---

[6]   Endurance argues that Team improperly raised this matter in a dispositive motion. Regardless of whether the procedure was appropriate, the question must be answered to address any of the motions.

[7]   The mere fact that different parties advocate for different construction of contractual language does not render the language ambiguous. The competing interpretations must both be reasonable to constitute a conflict meriting a finding of ambiguity. *See Am. Media, Inc. v. Home Indem. Co.*, 658 P.2d 1015, 1019 (Kan. 1983) ("To be ambiguous the contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language." (citation omitted)). As explained below, Team's proffered interpretation is not reasonable.

Courts look to the parties' intent to interpret written contracts. *Osterhaus v. Toth*, 249 P.3d 888, 896 (Kan. 2011). And if the contractual terms are clear, courts determine the parties' intent from the language of the contract. *Id.* (citation omitted). Courts use the meaning of the terms that is common, general, and plain. *Wood River Pipeline Co. v. Willbros Energy Servs. Co.*, 738 P.2d 866, 871 (Kan. 1987) (citation omitted). And "language used anywhere in the instrument should be considered and construed in harmony with all provisions and not in isolation." *Id.* It is unnecessary to construe any terms against the drafter when the contracting parties are "two large and sophisticated companies of equal bargaining power, each acting through experienced persons." *See id.* at 872.

### 1.    Contractual Construction of Change Order No. 2 to Team MSA

First, the Court concludes that the terms of Change Order No. 2 are unambiguous and that the governing contract is the Team MSA, including Change Order Nos. 1 and 2. It is <u>not</u> a combination of the Team and Furmanite MSAs plus all the change orders to each, as Team advocates. To accept Team's position would require the Court to view one phrase ("consolidate the two services contracts") in isolation and ignore the next paragraph of Change Order No. 2.

For ease of reference, the Court reprints the contractual language at issue here:

> **<u>Note</u>**: On February 29, 2016 Furmanite was acquired by TEAM Industrial Services, Inc. This change order will consolidate the two services contracts that Furmanite (902236) and TEAM (902228) hold with Westar Energy and become **effective as of September 1, 2017.**
>
> Furmanite Contract 902236 will be **<u>retired</u>** and all pending PO's under the previous FURMANITE supplier ID 0000533098 will be reissued under TEAM INDUSTRIAL SERVICES, INC., supplier ID 0000431446 to be governed by the terms & conditions of Contract 902228.

Doc. 305 at 6 ¶ 40.

Team focuses on the language in the "note" that states that the change order "will consolidate the two services contracts." Team asks the Court to rule that "consolidate" means "consolidate" and to find that the governing contract effective September 1, 2017 was a combination of both the Team and Furmanite MSAs plus their change orders. This request is nonsensical and inconsistent with the following paragraph that expressly explains how the two services contracts will be "consolidated."

The Court first looks at whether there is a conflict between the two paragraphs that renders the language ambiguous. The first paragraph, labeled "note," explains that Team's parent company acquired Furmanite's parent company. It then specifies that the services contracts will be "consolidated." The ordinary meaning of "consolidate" is "to join together into one whole: unite." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/consolidate. Accessed 3 Nov. 2022. Black's Law Dictionary defines consolidate as "To combine or unify (separate items) into one mass or body, esp. in order to make them more effective or easier to deal with." Black's Law Dictionary (11th ed. 2019). If the language stopped there, Team's interpretation might hold water. But it doesn't.

Instead, the next paragraph specifies that Furmanite's contract will be "retired," that pending purchase orders under Furmanite's ID will be reissued under Team's ID, and that the reissued purchase orders will be governed by the terms and conditions of Team's MSA. To "retire" means, among other things, "[t] withdraw from the market or from circulation." Black's Law Dictionary (11th ed. 2019). Similarly, Merriam-Webster lists several definitions, one of which is "withdraw: such as . . . to withdraw from circulation or from the market" or "to withdraw from the usual use or service." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/consolidate. Accessed 3 Nov. 2022.

Read as a whole, the language of the change order means that Team takes over Furmanite's services contract as of September 1, 2017 and Furmanite's contract will no longer be in service. From that point forward, Team's MSA will govern. This reading is further supported by common sense and the rate/price list attached to Change Order No. 2.

Logically, if the two contracts became "combined," both parties would be left with perpetual uncertainty about which provisions apply where the contracts conflict. One example of a difference is that Team was required to maintain a minimum of $5 million in insurance, but Furmanite was only required to maintain a minimum of $2 million. How would this be reconciled? And then, of course, there is the matter of Change Order No. 1 in Furmanite's contract, which said Westar may utilize an OCIP. Team argues that provision then was layered on top of the Team MSA, which didn't include the same provision. But why would "additional" provisions in one contract and not the other be automatically added on and not deleted? And, if Team inherited OCIP participation when taking over Furmanite's work, did the OCIP coverage only cover Team's work that had previously been completed by Furmanite? Or was it to cover Team for all future work?

Team has not explained how, practically speaking, a consolidation of the two contracts would work. Team just insists that the contracts are "materially indistinguishable," with "no practical impediment to" consolidation. Doc. 305 at 20 ¶ 3.a.2. But most of all, Team has not explained why the second paragraph (which is not labeled "note") says the Furmanite contract will be retired. Team merely repeats that it doesn't say "terminated." This is sophistry because to "retire" the contract means it is withdrawn from service.

The rate/price list also indicates the Furmanite contract is not merely added on top of the Team contract. If it were, presumably, the rate/price list from the Furmanite contract would continue to apply and there would be no need to craft a new one with services from both vendors

listed. And, if the contracts were layered, which rates/prices would apply when in conflict—the "old" rates/prices in the Furmanite contract or the new list attached to Change Order No. 2?

Team uses the rate list to try to show the parties meant for Team to inherit the OCIP coverage from Furmanite. The last digit on some of the labor rates allegedly indicates that Team was quoting an OCIP-adjusted price; not a non-OCIP price. Team contends the rates are discounted on the condition Westar would foot the bill for Team's participation in the OCIP.  But there is no evidence that Westar accepted "discounted" rates from Team or requested a discount. The evidence Team cites in support of this assertion is simply the Team Change Order No. 2 and accompanying rate/price list. Team also cites to the entire deposition of Wayne Watts. Watts was a historic Furmanite employee who became a Team salesperson. Team did not point with specificity to the evidence it claims supports its position as required by the rules.[8] Doc. 349 at 16-17, ¶ 32 & n.19-21. Westar, on the other hand, shows that when Watts drafted rates for submission, he was not yet aware that Westar had a separate contract with Team. It was also months before Westar proposed using the Team MSA going forward. Doc. 361 at 9 n.2. Team's arguments about discounts are not properly backed by evidentiary citations sufficient to challenge summary judgment (or to support its own motion). The alleged use of "discounted" rates does not justify Team's reading of Change Order No. 2 or undermine the unambiguous nature of it.

---

[8]  Team's lack of specific citations was in its consolidated response to Defendants' statements of undisputed facts. Team did finally submit pinpoint citations to Watts's testimony, but not until its reply memorandum to its own motion for summary judgment. Doc. 363 at 23 n.10. The pinpoint citations still do not create a genuine issue of material facts as to whether Watts calculated the "discounted" rates based on an understanding he should discount them for work to be completed by Team. And, in any event, Team should have offered the pinpoint citations initially instead of waiting for a reply brief to its own motion to provide them to the Court.

In sum, Team's proffered interpretation of Change Order No. 2 is illogical and untenable. The language itself is unambiguous.[9] Defendants' proffered reading of the language is correct, not Team's. Team's motion for partial summary judgment on contract construction is denied.

### 2.    Team's Coverage under the 2018 OCIP.

Because the Court finds that Change Order No. 2 does not import Furmanite's Change Order No. 1 relating to the OCIP into the Team MSA, Team's primary argument for inclusion in the OCIP falls. But even if the Court were to accept Team's interpretation of Change Order No. 2, Team's quest for inclusion would still fail.

Here is the critical problem with Team's position: Furmanite's Change Order No. 1 did not guarantee Furmanite's enrollment in the OCIP. Rather, it modified Articles 16 and 17 of Furmanite's MSA to add a new paragraph to each and to attach the OCIP Requirements. The two new paragraphs were identical—one for liability insurance and one for workers' compensation— and stated: "[Westar], at its sole option and cost, reserves the right to implement an [OCIP], and, except as otherwise provided herein, maintain at all times during the performance of this Contract, the insurance specified in Attachment 4, [OCIP Requirements]." Doc. 307-10 at 1. By their plain terms, the paragraphs only made participation in the OCIP an <u>option</u> for Furmanite. Furmanite had to take affirmative steps to enroll—steps that Team has never taken. <u>And</u> Westar had the sole

---

[9]    Even if the Court were to find the language ambiguous, the outcome would not differ. The Court reviewed the parol evidence submitted by both parties. This includes evidence that Stephanie Hernandez, a one-time member of the Team contracts group, said the purpose of Change Order No. 2 was to have the Team contract become the operative governing contract. It also includes a letter drafted by Team employees August 11, 2017, which indicated that all "subsequent quotes and invoices" would be issued under the Team MSA and the Furmanite MSA would be retired. And when Team employee Wayne Watts indicated the Furmanite agreement would be terminated, Jesse Martinez of Westar replied, "That's exactly what I would like to do." Doc. 322-12 at 3. If the Court were to use that evidence to determine the intent of the contracting parties, the Court would reach the same conclusion on the meaning of the language in Change Order No. 2. If anything, the parol evidence weighs even heavier against Team than the plain language of the contract. No reasonable jury could find otherwise.

authority to include or exclude Team from the program. There is no indication, in writing or otherwise, that Westar approved Team for the program. All evidence is to the contrary.

Team bears the burden to show it falls within the policy's coverage. *Advantage Homebuilding, LLC v. Md. Cas. Co.*, 470 F.3d 1003, 1008 (10th Cir. 2006) (quoting *Brumley v. Lee*, 963 P.2d 1224, 232 (Kan. 1998)). In an attempt to meet this burden, Team makes several arguments. <u>First</u>, Team argues logic; it must be covered because Furmanite was a named insured for the 2018 OCIP policy but was not performing work at the JEC by that time. So, according to Team, if the policy logically couldn't have been covering Furmanite, then it must have covered Team, who assumed Furmanite's workload at the JEC. Team maintains that because Team replaced Furmanite by doing the same work at the same location then the OCIP mistakenly named Furmanite when it should have named Team. <u>Second</u>, Team argues this is not a matter of "transferring" coverage so Zurich's consent was unnecessary. <u>Third</u>, and finally, Team insists that "enrollment" is unnecessary because Furmanite received automatic renewals. Team claims Furmanite (and, by extension, Team), was entitled to continuation of coverage for the work that Furmanite historically performed and the original enrollment no longer matters. Each of these arguments fails.

Team's "logic" doesn't pass muster. Even if there was not a continuing reason to insure Furmanite, it doesn't necessarily follow that Team must have inherited Furmanite's insurance coverage. If the parties didn't contract for Team to receive OCIP coverage (and they didn't), simple "logic" doesn't import an agreement where there otherwise is none.

Team's attempt to ignore Zurich's transfer requirements is unsupported. Zurich's consent was required under the policy, and without such consent (as well as Westar's blessing), Team was

ineligible to step into the shoes of Furmanite and become an insured. The record contains no evidence of Zurich's consent, so the coverage was not transferrable to Team.

And finally, the language of the OCIP Requirements make "enrollment" relevant. They mandate that a contractor <u>enroll</u>. And the commonly understood definition of "enroll" suggests an action. Merriam Webster defines it as a transitive verb: "1: to insert, register, or enter in a list, catalog, or roll; 2: to prepare a final perfect copy of (a bill passed by a legislature) in written or printed form; 3: to roll or wrap up." "Enroll." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/enroll. Accessed 31 Oct. 2022. Black's Law Dictionary also defines enroll as a verb: "1. To register or transcribe (a legal document, as a deed) into an official record on execution. . . . 2. To prepare (a bill passed by the legislature) for the executive's signature." Black's Law Dictionary (11th ed. 2019). Team, on the other hand, wants the Court to utilize a more "expansive" reading of the term "enrolled." Team argues that it stepped into the shoes of Furmanite and thereby received all the benefits Furmanite received through its MSA. But the OCIP documents—those that govern the relationship between Westar and its OCIP participants—do not contemplate this method of enrollment. The method and requirements for becoming an insured are clearly identified. Team cannot avoid those requirements by claiming that renewals erased the written enrollment mandate. And enrollment doesn't occur by performing certain work at the designated project. To qualify as an insured, a contractor must (1) be enrolled and (2) perform operations at a designated project. Team never enrolled and therefore cannot qualify as an insured under the OCIP.

For these reasons, Team has not shown it is entitled to coverage under the 2018 OCIP. Team is not entitled to partial summary judgment on its contractual construction arguments.

**B.      Should the Court reform the Zurich insurance policy?**

Team next asks the Court to reform the Zurich insurance policy to list Team as the insured instead of Furmanite. Team concedes that <u>before</u> Team took over Furmanite's work, Westar chose not to include Team in the OCIP. But Team claims there are disputed factual issues about whether Westar maintained this position after Team began doing the work Furmanite had in the past.

Team also argues the record shows that Westar and Aon made a mistake when they didn't substitute Team for Furmanite in the 2018 renewal materials. Team wants a factfinder to decide whether "Westar, Aon, and Zurich intended to issue a policy for the ben[e]fit of an entity all knew or had reason to know was not the entity actually performing the work at the JEC." Doc. 350 at 12. Team believes its own actions were consistent with a belief it was enrolled, and that Westar and Aon simply ignored the indicators that Team was included in the OCIP instead of Furmanite. The alleged "indicators" are that Team actively input "0" hours into Aon's portal from June 2017 onward except for one month, and that Team would not have done this unless it thought it was an obligation under Westar's OCIP Requirements.

Reformation is an equitable remedy. Courts can reform contracts when necessary to correct mutual mistakes of fact (or for fraud). *Liggatt v. Emps. Mut. Cas. Co.*, 46 P.3d 1120, 1128 (2002). But an agreement is still necessary. *Id.* (citing 66 Am. Jur. 2d, Reformation of Instruments § 1 at 226-27). The written contract must contain an error that doesn't reflect the agreement. *Id.* In the absence of fraud, the party claiming mutual mistake must show that it exists by clear and convincing evidence. *Evergreen Recycle, L.L.C. v. Ind. Lumbermans Mut. Inc. Co.*, 350 P.3d 1091, 1121 (Kan. Ct. App. 2015) (citation omitted). Reformation is an "extraordinary remedy" that must be used "only with great caution." *Id.* at 1120.  Courts "will not reform an insurance contract to 'conform to the parties' negotiations or haphazardly expressed intentions.'" *Id.* at 1121 (citation

omitted). And courts will not "rewrite the parties' agreement and foist upon the parties a contract they never made." *Liggatt*, 46 P.3d at 1128.

Zurich lacked the authority to unilaterally grant Team coverage under the Westar OCIP. That authority lay solely with Westar. Contrary to Team's argument, Change Order No. 2 of the Team MSA did not evince an intent on the part of Westar for Team to enroll in the OCIP. The Court has already addressed the meaning of "consolidated." And the Furmanite MSA—the only written authority for Furmanite to enroll in the OCIP—was "retired" as a result of Change Order No. 2. Moreover, Team's payroll reporting activity does not indicate there was a mutual mistake on the part of Team and Zurich or anyone else. Team has not brought forth facts suggesting that Zurich's, Aon's, and Westar's silence while Team reported "0" hours through Furmanite's login would merit reformation of an insurance contract that Westar had never authorized and for which Team had never enrolled.

The uncontroverted evidence shows that any mistake was a unilateral one on the part of Team. There is simply no evidence to suggest that anyone else intended for the named insured to be Team instead of Furmanite for 2018. There certainly is no clear and convincing evidence from which a reasonable jury could find a mutual mistake. Zurich is entitled to summary judgment on Team's reformation claim.

### C.     Did either Zurich or Westar breach a contract with Team?

Team next asserts both Zurich and Westar breached their contracts with Team. Again, the Court disagrees. There is insufficient evidence of the elements of a breach to avoid summary judgment. A breach-of-contract claim under Kansas law requires a showing of the following elements: "(1) the existence of a contract between the parties; (2) consideration; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) defendant's breach of

the contract; and (5) that plaintiff was damaged by the breach." *Ice Corp. v. Hamilton Sundstrand Inc.*, 444 F. Supp. 2d 1165, 1169 (D. Kan. 2006).

### 1.      Zurich

Team alleges that Zurich breached a contract to insure Team by failing to defend and indemnify Team in the Texas case. This claim fails for many of the reasons already discussed.

Lack of enrollment, of course, is one of the core problems. Team never enrolled in the OCIP. There is no evidence of a workers' compensation policy and certificate of insurance issued in Team's name. Without coverage, there can be no duty to defend or indemnify. Team cannot show the first element (an actual contract) for a breach of contract.

Team argues that Zurich was "aware" that Team assumed Furmanite's work at the JEC. But "awareness" is irrelevant. It has nothing to do with whether Zurich's insurance policy covered Team. As the Court has already noted, the policy also includes a prohibition on transfer of benefits without consent. And, once again, it bears mentioning that Zurich had no power on its own to enroll Team. That decision rested solely with Westar.

In an effort to show it meets element three (performance), Team contends that it met its payroll reporting requirements for coverage. And Team suggests that its payroll reporting underscores its belief that it was covered by the OCIP. This ignores the fact that Team's reporting was sporadic, erroneous, and based on the use of Furmanite's login credentials. Team, however, maintains these are auditing issues and not coverage issues.

Team's payroll reporting activities do not create a genuine issue of material fact as to whether Zurich contracted to provide coverage for Team. Team cannot back Zurich (or Westar) into liability under a contract by taking action that was not required. And, in any event, Team did

not report hours for the work that resulted in the fatal accident. Team has not created a genuine issue of material fact through its reporting activity.

Westar did pay Zurich a premium for the work Team did at the JEC from June 2017 forward. These payments, however, also do not create a contract including Team as a beneficiary. Team didn't report any of its work to calculate premiums. Because Zurich used Aon's payroll reporting system to calculate premiums, and Team entered "0" hours even when employees had done work (except for one month), the premium calculation was likely inaccurate.[10]

In sum, Team was not included in the OCIP. Zurich had no contractual relationship with Team. There is not a viable breach of contract claim against Zurich, and no reasonable jury could conclude otherwise.

### 2.      Westar

 Team alleges that Westar breached its obligation under the "consolidated Furmanite contract" to continue (Furmanite's) OCIP coverage for the benefit of Team. Doc. 350 at 14. According to Team, "[t]he crux of this claim is whether Westar breached the Team-Westar contract and caused damages in the event there is no OCIP coverage." *Id.* at 15. Team asks the Court to decide that the "consolidated contract" obligated Westar to include the contractor performing work at JEC (Team) in the 2018 OCIP. This is because the OCIP Requirements (attached to Furmanite's Change Order No. 1) stated that Westar was bound to continue coverage once it began unless it gave proper notice and an opportunity for replacement coverage for Furmanite. Doc. 327-6 at 13.

Team's arguments fail for the same reasons already described. Specifically, Team MSA's Change Order No. 2 did not result in Furmanite's contract being layered on top of Team's. In the

---

[10]  The Court suspects this is where Team would like the Court to consider the fact that the NCCI issued a combined "experience modifier" for Team and Furmanite. But Team did not overtly make that connection or argument in any of its briefing on the dispositive motions. The Court will not be its advocate. And, regardless, it does not change the outcome.

absence of this "layering," Team did not inherit Westar's promise to Furmanite to continue coverage.

At the risk of sounding repetitive, there is <u>not</u> a contract term that requires Westar to allow Team to participate in its OCIP. Even Furmanite was not guaranteed participation in the OCIP. Instead, the Change Order allowed Furmanite to enroll in Westar's OCIP. And even if the Team contract merged with the Furmanite contract to become one "consolidated contract"—contrary to the language that the Furmanite contract was "retired"—then at most, Westar would have had the option (not obligation) to allow Team to enroll in its OCIP. There was simply no duty on the part of Westar to select <u>any contractor</u> for participation.

Even if there were a contractual provision allowing Team to enroll in the OCIP (like the one in the Furmanite Change Order No. 1), the result remains the same. Westar did not designate Team for the OCIP. And Team did not enroll in the OCIP. Both of these actions are required before Team would be covered under the OCIP.  No reasonable jury could find a breach of contract under these facts.

### D.     Did Westar breach a fiduciary duty to Team?

Team next argues that Westar had an independent fiduciary duty to ensure Team had continuance of insurance after its acquisition of Furmanite. Team contends that Westar was not merely the OCIP sponsor or owner, but it was also the "administrator." It is through this role that Westar allegedly became more than a mere contractor.

Under Kansas law, "the essential elements of a breach of fiduciary duty claim are duty, breach, causation, and damages." *Osage Cap., LLC v. Bentley Invs. of Nevada III, LLC*, 2014 WL 902189, *7 (Kan. Ct. App. 2014). A fiduciary duty may be "implied in law due to the factual situation surrounding the involved transactions and the relationship of the parties to each other and

to the questioned transactions." *Rajala v. Allied Corp.*, 919 F.2d 610, 614 (10th Cir. 1990) (quoting *Denison State Bank v. Madeira*, 640 P.2d 1235, 1241 (Kan. 1982)). This depends on the facts and circumstances of the case. *Id.* Factors considered are whether a "peculiar confidence [is] placed by one individual in another," whether a person has "a duty to act primarily for the benefit of another," where a person has and can "exercise influence over another" or has "superiority" over the other, and whether "the property, interest or authority of the other is placed in the charge of the fiduciary." *Id.* (quoting *Denison*, 640 P.2d at 1241) (emphasis omitted). But the key consideration is whether there was "a conscious assumption of such duties by the one sought to be held liable as a fiduciary." *Id.* (quoting *Denison*, 640 P.2d at 1243-44). "[T]he confidence reposed by one person [must be] actually accepted by the other, and merely reposing confidence in another may not, of itself, create the relationship." *Id.* at 615.

Kansas allows "tort claims such as breach of fiduciary duty [to] be pleaded in parallel with breach-of-contract claims only if the tort is independent of the bargained-for duties in the contract." *Swimwear Sol., Inc. v. Orlando Bathing Suit, LLC*, 309 F. Supp. 3d 1022, 1032 (D. Kan. 2018). Likewise, "the independent tort must cause damages beyond those suffered by breach of contract." *Diederich v. Yarnevich*, 196 P.3d 411, 420 (Kan. Ct. App. 2008).

Team has presented no evidence that Westar undertook an independent fiduciary duty to Team. Team has not pointed to facts suggesting (1) Westar had the duty to act primarily for Team's benefit; (2) Westar was in a position of superiority over Team; or (3) Team placed its own interests in Westar's care. And Team certainly has not demonstrated a "conscious assumption of [the] duty" by Westar to provide Team with OCIP coverage. Team repeatedly emphasizes that Westar was the "administrator" of the OCIP instead of the owner or sponsor. But Team does not explain how this

difference in terminology results in the creation of a fiduciary duty. Team focuses on duties Westar allegedly owed Furmanite, not Team.

There is no evidence suggesting that Westar consciously assumed a fiduciary duty to provide Team with OCIP coverage. The relationship between Westar and Team was contractual. Team has made no showing how an alleged fiduciary duty differs from Westar's contractual obligations. Neither has it demonstrated how claimed damages differ for the two claims. There is no evidentiary basis for Team's claim of breach of fiduciary duty to proceed to trial. No reasonable jury could find in its favor. The Court grants summary judgment for Westar on this claim.

### E.      Can Team recover from Zurich or Westar on a promissory estoppel theory?

Team's final effort to secure payment for the Texas case defense and verdict is to assert a promissory estoppel theory against both Zurich and Westar. Once again, Team's effort falls short. Promissory estoppel presents an alternative claim to one for breach of contract. *Pizza Mgmt., Inc. v. Pizza Hut, Inc.*, 737 F. Supp. 1154, 1167 (D. Kan. 1990). A party may resort to promissory estoppel where proof of an essential element of a contract fails. *Id.* The promissory estoppel doctrine, which involves "performance in reasonable reliance on a promise," may create a legally binding contract where it otherwise doesn't exist. *Sch.-Link Techs., Inc. v. Applied Res., Inc.*, 471 F. Supp. 2d 1101, 1114 (D. Kan. 2007). But the "promise itself must define with sufficient particularity what the promisor was to do." *Bouton v. Byers*, 321 P.3d 780, 787-88 (Kan. Ct. App. 2014). The elements of promissory estoppel are: "a) defendant made a promise, b) the promise was made under circumstances where the promisor intended and reasonably expected the promise would be relied upon by the promisee, c) the promisee acted reasonably in reliance on the promise, and d) a refusal to enforce the promise would result in an injustice." *EDO Corp. v. Beech Aircraft Corp.*, 911 F.2d 1447, 1454 (10th Cir. 1990) (citations omitted).

Team argues summary judgment is not warranted on this claim because "[t]he record reflects Westar, Aon, and Zurich either directly or indirectly were communicating information to Team to cause Team to understand it was covered by the OCIP and knew Team was engaging in conduct that would have made sense only if Team was enrolled in the OCIP." Doc. 305 at 17. In support, Team cites a series of emails that appear to be related to a different OCIP and work done at a location other than the JEC (and not even a Westar facility). Team's evidence is insufficient to create a triable issue of fact on whether Zurich or Westar made an enforceable promise.

Team has no evidence of any promise made by Zurich—let alone a sufficiently defined promise. And although Team has a contract with Westar, this fact itself makes Team's promissory estoppel claim untenable. First, the parties have defined their rights by an explicit contract, making promissory estoppel unavailable. Second, the only promise Team alleges Westar made was a promise to consolidate the Furmanite and Team contracts. This promise fails for the reasons already discussed. Without an extra-contractual promise, Team can't show that Westar intended or reasonably expected Team would rely on such promise. And the record is devoid of evidence that Team relied on any promise of OCIP coverage.

Team argues (in another version of the same argument addressed previously) that because it reported payroll data, Zurich and Westar are estopped from disclaiming OCIP coverage. Team represents it would not have engaged in the "labor-intensive task" of reporting if it didn't think it had a duty to comply with OCIP payroll rules. Doc. 305 at 24 ¶ 36.

The reporting of payroll data, even in reliance on Aon's representations, is insufficient to create a promise of insurance coverage on the part of Zurich or Westar. The purpose of reporting is to calculate premiums (and later verify their accuracy). Team didn't accurately report, making any premiums paid by Westar unsupported. And Team didn't report any payroll for work done

that caused the accident at issue. There simply is no evidence from which a reasonable jury could find promissory estoppel applies.

### F.      Is Most entitled to dismissal from the case?

The Court's resolution of the pending summary judgment motions leaves one dispositive issue to be decided: Is Most also entitled to have Team's case against her dismissed? The only claim against Most is the claim for declaratory judgment. Team's inclusion of Most in this suit is somewhat unusual. Team included her in this action "to legally bind her to any OCIP coverage determination." Doc. 305 at 47. Practically speaking, Team hoped to use this federal claim to win on its Texas affirmative defense. If this Court had ruled in Team's favor before the Texas court issued judgment, Team would have argued this Court's decision bound the Texas court to find its affirmative defense precluded Most's wrongful death claim. But because the Texas court already ruled against Team, Team hopes to use this Court's favorable judgment to overturn the Texas court's dismissal of its affirmative defense.

It is not uncommon for a personal-injury plaintiff to be included in a declaratory judgment action involving disputed insurance. *See, e.g.*, *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270 (1941) (insurer brought declaratory judgment action against insured and state court plaintiff); *Nautilus Ins. Co. v. 8160 S. Memorial Dr., LLC*, 436 F.3d 1197 (10th Cir. 2006) (same). The personal-injury plaintiff is included to prevent her from later suing the insurer. But here, the alleged insured (Team) is suing the insurers to establish coverage and suing Most to bind her to the decision for purposes of Team's state court affirmative defense against her tort claim. Most has no interest in later suing the insurers, regardless of the outcome of this case. This seems to be an improper use of declaratory judgment as to Most (and also seems at odds with Team's stance on collateral estoppel, which the Court does not reach as discussed *supra* in footnote 1).

But whether Most's inclusion in this suit was proper or not, the claims against Westar and the insurance companies—those defendants that have an actual, concrete interest in this litigation—no longer remain. Because the Court has ruled against Team on its declaratory judgment claim, no controversy exists against Most. Team cannot obtain relief against Most if it cannot obtain relief against Westar or the insurance companies. And lack of an actual controversy means this Court no longer has jurisdiction over Team's claim against Most. *See Columbian Fin. Corp. v. BankInsure, Inc.*, 650 F.3d 1372, 1382 (10th Cir. 2011). But even if the Court's rulings in favor of the other defendants did not deprive it of jurisdiction over the claim against Most, the Court declines to exercise jurisdiction over the declaratory judgment claim against Most and dismisses it without prejudice.[11] *See* 28 U.S.C. § 2201 (providing that even if a court has jurisdiction over a controversy, it <u>may</u> declare the rights of an interested party); *Brillhart v. Excess Ins. of Am.*, 316 U.S. 491, 494 (1942). This outcome is appropriate given the case's procedural posture and the potentially inappropriate use of this suit against Most.

## IV.   CONCLUSION

The uncontroverted facts show: (1) Team is <u>not</u> entitled to a declaratory judgment against all defendants because Change Order No. 2 did not give Team all Furmanite's rights and Team didn't enroll in the OCIP; (2) reformation of the Zurich policy to substitute Team's name for Furmanite's is not appropriate; (3) neither Zurich nor Westar breached a contract with Team; (4) Westar had no independent fiduciary duty to Team; (5) no defendant promised or even implied

---

[11] When evaluating whether to exercise jurisdiction over a declaratory judgment claim, courts evaluate the *Mhoon* factors: "[1] whether a declaratory action would settle the controversy; [2] whether it would serve a useful purpose in clarifying the legal relations at issue; [3] whether the declaratory remedy is being used merely for the purpose of 'procedural fencing' or 'to provide an arena for a race to res judicata'; [4] whether use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and [5] whether there is an alternative remedy which is better or more effective." *State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 983 (10th Cir. 1994) (citation omitted). With the dismissal of the claims against all other defendants in this case, all *Mhoon* factors weigh against maintaining jurisdiction over the one remaining declaratory judgment claim against Most.

Team had OCIP coverage, so promissory estoppel does not apply; and (6) the remaining claim against Most should be dismissed. Summary judgment is therefore granted for Zurich, Westar, Westchester, and Endurance on all claims. And Most is entitled to dismissal of the one claim against her. Team's request for partial summary judgment is denied. The Court finds the remaining motions not otherwise addressed in this order moot.[12]

THE COURT THEREFORE ORDERS that the following motions are GRANTED: Zurich's motion for summary judgment (Doc. 306) and Westar's motion for summary judgment (Doc. 315).

IT IS FURTHERED ORDERED that the following motion is GRANTED IN PART AND DENIED IN PART: Most's motion to dismiss and/or for judgment on the pleadings (Doc. 329). The claim against Most is DISMISSED WITHOUT PREJUDICE.

IT IS FURTHERED ORDERED that the following motion is DENIED: Team's motion for partial summary judgment regarding contractual construction (Doc. 321).

IT IS FURTHER ORDERED that the following motions are GRANTED IN PART AND MOOT IN PART: Endurance's motion for summary judgment (Doc. 312) and Westchester's motion for summary judgment (Doc. 323).

IT IS FURTHER ORDERED that the following motions are MOOT: Zurich's motion for summary judgment on collateral estoppel (Doc. 309); Defendants' motion to exclude the expert testimony of Donald Bendure (Doc. 311); Westar's motion to strike jury demand (Doc. 318); Defendants' motion to exclude the expert testimony of Robert Marshburn (Doc. 320); Team's

---

[12] The Court has not used any of the challenged expert testimony for its determinations herein, making any ruling on the pending *Daubert* motions unnecessary.

motion to exclude Defendants' expert opinions (Doc. 326); Team's motion for an advisory jury as to Westar (Doc. 328); and Team's motion to strike reply brief submitted by Most (Doc. 364).

This case is closed.

IT IS SO ORDERED.


Dated: November 16, 2022                    /s/ *Holly L. Teeter*
                                            HOLLY L. TEETER
                                            UNITED STATES DISTRICT JUDGE